UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KAILAH CARTER-SAPP, *as
Administrator of the Estate of Jeffrey
Sapp, Deceased*,

        Plaintiff,

    v.

CORRECTION OFFICER HUPKOWITZ, *et al.*,

        Defendants.
_____

20-CV-1889-LJV
DECISION & ORDER

On December 21, 2020, Kailah Carter-Sapp, the daughter of Jeffrey Sapp and administrator of his estate, commenced this action under 42 U.S.C. § 1983.  Docket Item 1.  Sapp died on December 19, 2017, while he was in custody at the Wyoming Correctional Facility ("Wyoming").  *Id.*  Carter-Sapp says that the defendants—the health services director at Wyoming, the Wyoming Superintendent, and four current and former Wyoming correction officers—were deliberately indifferent to the serious dangers that Sapp faced at Wyoming, which ultimately led to his death.  *Id.*

On July 11, 2021, defendant William Fannan, a former correction officer, moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).  Docket Item 19.  Carter-Sapp responded to that motion on August 9, 2021, and Fannan replied about two weeks later.[1]  *See* Docket Items 21, 23.

---

[1] Carter-Sapp failed to file a timely response to the motion to dismiss; she then responded about a week after this Court ordered her to show cause why the motion should not be decided on Fannan's submissions alone.  *See* Docket Items 20, 21.  Carter-Sapp's attorney has offered a declaration explaining the delay, *see* Docket Item

For the following reasons, Fannan's motion to dismiss will be granted unless Carter-Sapp files an amended complaint correcting the deficiencies noted below.

## FACTUAL BACKGROUND[2]

### I. THE WYOMING DRUG-DISTRIBUTION RING

About eight months before his death in December 2017, Sapp was transferred to Wyoming. Docket Item 1 at ¶ 21. At Wyoming, Sapp became involved in a drug-

---

21-1; Fannan says that the explanation is inadequate and that this Court should not consider the untimely response, *see* Docket Item 23 at 2.

Carter-Sapp's attorney says that there is "good cause" to accept the untimely filing because he believed that the briefing schedule applicable to "Summary Judgment Motions" under Local Rule of Civil Procedure 7(b)(2)(A) applied to the defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Docket Item 21-1. Although the local rule to which counsel refers explicitly applies only to "Summary Judgment Motions," Carter-Sapp's counsel says that because a motion to dismiss under Rule 12(b)(6) "is summary in nature," he "thought that the [Local Rule 7(b)(2)(A)] timeline would apply to any and all dispositive motions." *See id.* at ¶ 5.

The support for counsel's argument, to put it charitably, is thin. After all, the Federal Rules of Civil Procedure specifically provide for motions to dismiss under Rule 12(b) and motions for summary judgment under Rule 56; they do not also provide for a hybrid motion that is "summary in nature" under some other rule. *See generally* Fed. R. Civ. P. 12(b) (motion to dismiss); Fed. R. Civ. P. 56 (motion for summary judgment); Fed. R. Civ. P. 12(d) (distinguishing between the two). And while counsel is correct that a motion to dismiss may be "treated as [a] motion[] for summary judgment" in certain circumstances, *see* Docket Item 21-1 at ¶ 4, that has not happened here, *see* Fed. R. Civ. P. 12(d) (outlining how and when that conversion would apply).

In light of all that, counsel's conflation of a motion to dismiss and a motion for summary judgment is puzzling. Nevertheless, because counsel has offered another reason for an extension "[t]o the extent th[e] Court doesn't agree with" that argument—namely, his crowded docket—his request for an extension is granted and this Court considers Carter-Sapp's response. *See* Docket Item 21-1 at ¶¶ 7-10.

[2] On a motion to dismiss, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

2

distribution ring that included both correction officers and inmates.  Sapp's acquaintance "from the neighborhood" introduced him to the ring; that acquaintance "was involved with several other inmates and [c]orrection [o]fficers, including William Fannan[,] in the distribution" of synthetic marijuana.  *Id.* at ¶ 28.  Wyoming correction officers would bring drugs into Wyoming; in turn, the prisoners would distribute them.  *Id.* at ¶ 25.

At some point, Sapp's participation in the drug-distribution ring was uncovered.  Sapp believed that this revelation posed a threat to his life, and he told his sister about that during a visit "just prior to [his] death."  *Id.* at ¶¶ 24-28.  More specifically, Sapp told his sister about an "off[-]the[-]record meeting" with a "supervising [c]orrection[] [o]fficer," who "told [Sapp] that [Wyoming] had a zero tolerance policy and that there would be severe consequences for his behavior."  *Id.* at ¶ 25.  Although the supervising officer did not clarify why Sapp would face "severe consequences," Sapp believed that the officer was referring to Sapp's involvement in the drug-distribution ring.  *Id.*

After the meeting with the supervising officer, Sapp was "unable to sleep and had a very bad feeling," and he told his sister that "he was considering a transfer request as he was [afraid] for his life."³  *Id.* at ¶ 26.  Sapp also told his sister that "there were [c]orrection [o]fficers who wore black gloves all the time[] and it was known that [those officers] were not to be reckoned with[] and that [they] were part of a gang."  *Id.* at ¶ 27.  Carter-Sapp does not offer further allegations about that gang, although Sapp presumably felt threatened by those officers.

---

³ Sapp separately told his "[c]orrection[] counselor" that he was "afraid for his life," although the complaint does not clarify whether that comment also was related to Sapp's involvement in the drug-distribution ring.  *See* Docket Item 1 at ¶ 22.

Wyoming officials were not the only parties interested in the drug-distribution ring. Sometime before Sapp's death, "the New York State Troopers and Wyoming County District Attorney's [O]ffice had sought to speak with Sapp [about] the guards involved with drug smuggling." *Id.* at ¶ 29. And on December 18, 2017, "Fannan[] was arrested and charged with promoting prison contraband."[4] *Id.*

## II.  SAPP'S DEATH IN THE SPECIAL HOUSING UNIT

The same day that Fannan was arrested, defendants Thomas J. Sticht and Watch Commander Kibler moved Sapp to the SHU over Sapp's objection. *Id.* at ¶¶ 29-30. Sapp told Sticht, Kibler, and the "other officers who moved him" that his relocation to the SHU "would jeopardize his life." *Id.* at ¶ 33. Sticht and Kibler nevertheless "remov[ed] [Sapp] to a secluded section of the jail amongst individuals who were involved in the drug[-]running ring." *Id.* at ¶ 32. Carter-Sapp says that Sapp's relocation to the SHU "on the same date as Fannan's arrest was done with the intent to keep [Sapp] silent about what he knew [about] other criminal state actors." *Id.* at ¶ 29.

On the morning of December 19, 2017, Sapp was "seen by [Wyoming's] medical director[] . . . during morning rounds." *Id.* at ¶ 31. Sapp told the director that "he was on a hunger strike and refused his morning meal." *Id.* The medical director then "encouraged fluids for [Sapp] and [] notified [the] Facility Health Services Director . . . about [Sapp's] hunger strike." *Id.* Although a "SHU Correction Officer" told the medical

---

[4] Although the complaint says that Fannan was arrested in December 2019, *see* Docket Item 1 at ¶ 29, the Court assumes that this is an error, *see id.* (alleging that Fannan's arrest and Sapp's relocation to the special housing unit ("SHU") occurred on the same day).

director "that a mental health referral was in place, . . . . there was no special monitoring done." *Id.*

Sapp died later that afternoon, although the exact cause of death is disputed. "According to incident reports authored by the [d]efendants," *id.* at ¶ 34, the events unfolded as follows. Around 1:30 p.m., defendant Correction Officer Hupkowitz "was conducting rounds and noticed that the window into [Sapp's] cell [] was obstructed with paper." *Id.* Hupkowitz "knocked on the cell door and instructed [Sapp] to remove the paper," but Sapp did not respond. *Id.* Although Hupkowitz "yelled to officers . . . for assistance," he "did not look through the slot to see if [Sapp] was in distress [or] take any other action." *Id.* Instead, Hupkowitz moved on from Sapp's cell and "continued to do his rounds." *Id.*

A few minutes later, another correction officer asked Sapp to remove the paper that was obstructing the window. *Id.* at ¶ 35. After Sapp again did not respond to that request, a third officer "ordered [Sapp's] feed-up food slot to be opened." *Id.* at ¶ 36. Through that slot, the correction officer saw "that [Sapp] was slumped over with a bed sheet tied around his neck and was unresponsive"; the officer then "ordered [Sapp's] cell door opened." *Id.* By that time, about ten minutes had passed since Hupkowitz first saw the paper obstructing the window in Sapp's cell. *Id.*

Once Sapp's door was opened, Sapp was "cut down by [c]orrection [o]fficers." *Id.* at ¶ 38. At that point, Sapp still had a pulse and was breathing, and someone attempted to resuscitate him. *Id.* at ¶ 39. Sapp then was taken from his cell to the Wyoming infirmary. *Id.* at ¶ 40. He was pronounced dead at 2:08 p.m., but for some reason his death certificate lists his time of death as 4:51 p.m. *Id.* at ¶ 41.

Prison officials ruled Sapp's death a suicide, but Carter-Sapp insists that it was not. *See id.* at ¶¶ 1, 42. While Carter-Sapp acknowledges that Sapp "had a prior history of psychiatric issues," including "suicidal ideations," she says that "all Wyoming [] inmates state [that] it is impossible to hang oneself in the [SHU]" and that Sapp's death therefore could not have been self-inflicted. *Id.* at ¶¶ 1, 43. Instead, Carter-Sapp says, Sapp was "killed by the individuals who he was with at the time of his death": two Wyoming correction officers who are named as defendants in this case. *Id.* at ¶ 1.

## LEGAL PRINCIPLES

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

"The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes, which includes punishments that 'involve the unnecessary and wanton infliction of pain.'" *Morgan v. Dzurenda*, 956 F.3d 84, 88 (2d Cir. 2020) (alterations omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Moreover, the Eighth Amendment "imposes duties on [prison] officials, who

6

must . . . 'take reasonable measures to guarantee the safety of [] inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). So, "[p]ursuant to *Farmer*, an inmate seeking to establish an Eighth Amendment violation for failure to protect or deliberate indifference to safety must prove (1) 'that the plaintiff is incarcerated under conditions posing a substantial risk of serious harm,' and (2) that the prison official had a 'sufficiently culpable state of mind,' which in 'prison-conditions cases' is 'one of deliberate indifference to inmate health or safety.'" *Morgan*, 956 F.3d at 89 (alterations omitted) (quoting *Farmer*, 511 U.S. at 834).

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

"Second, the charged official must act with a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Id.* "More specifically, a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

As an initial matter, it is unclear exactly what Carter-Sapp says is the "sufficiently serious" deprivation that would satisfy the objective prong of an Eighth Amendment violation. Carter-Sapp may be arguing that Sapp's involvement in the drug-distribution ring put him at an increased risk of self-harm. *See, e.g.*, Docket Item 1 at ¶¶ 52-53 (pointing to "Sapp's [] mental health history and [] hunger strike" as "indications" that Sapp "was under a substantial risk of serious harm"). On the other hand, Carter-Sapp may be arguing that Sapp's involvement put him at an increased risk of harm from other inmates or Wyoming staff, which culminated in Sapp's death—allegedly at the hands of two guards. *See id.* (pointing to "motives from [c]orrectional staff involved in drug running to harm Sapp" as another "indication[]" that Sapp "was under a substantial risk of serious harm"). Or Carter-Sapp may be arguing that Sapp's involvement in the ring led to both an increased risk of self-harm and an increased risk of harm from others, including Wyoming staff.

Assuming that those risks satisfy the objective prong of an Eighth Amendment violation, however, Carter-Sapp has not alleged facts suggesting that Fannan acted with deliberate indifference to those risks. First, Carter-Sapp has not alleged a sufficient connection between Fannan's actions and an increased risk of self-harm. Carter-Sapp alleges only that all defendants, including Fannan, "were aware of [Sapp's] medical and psychiatric history." *Id.* at ¶ 43. Even assuming that conclusory allegation is true,[5]

---

[5] Beyond the bare assertion of the defendants' collective knowledge, Carter-Sapp offers no other indication that Fannan was aware of Sapp's mental health history. So this Court need not credit that conclusory allegation as true. *See Iqbal*, 556 U.S. at 680-81 ("[B]are assertions[ which] amount to nothing more than a formulaic recitation of the elements of a constitutional [] claim . . . . are conclusory and not entitled to be assumed true." (citation and internal quotation marks omitted)).

8

Carter-Sapp does not allege how Sapp's involvement in the drug-distribution ring shows that Fannan's actions exacerbated Sapp's mental health issues or otherwise increased the risk that he would die by suicide.

Instead, Carter-Sapp seems to imply that Fannan's and Sapp's involvement in the ring necessarily means that Fannan and Sapp crossed paths. But even if that is true, it is not at all clear from the complaint that Fannan brought Sapp into the drug-distribution ring, knew that Sapp was involved in the ring, or even interacted with Sapp in the ring. Indeed, Carter-Sapp says that Sapp's neighborhood acquaintance was the one to rope Sapp in. *See id.* at ¶ 28. So how Fannan's involvement in the ring supposedly put Sapp at risk is a mystery.

And the link between Fannan and Sapp's relocation to the SHU and alleged death at the hands of two other guards is even more tenuous. Carter-Sapp says that Sapp's relocation to the SHU was done "at the behest of" two other defendants, even though Sapp told those defendants that the move "would jeopardize his life." *See id.* at ¶¶ 32-33. But Carter-Sapp does not say that Fannan orchestrated the decision to move Sapp, knew about or participated in that decision, or was involved in the move in any way. In fact, the only allegation related to Fannan on or after December 18, 2017, is that Fannan was arrested, *see id.* at ¶ 29; at that point, Fannan drops out of the picture entirely.

Without a clearer link between Fannan's conduct and Sapp's involvement in the drug-distribution ring, or without some allegation about something Fannan did or did not do that increased the risk to Sapp, Carter-Sapp has not alleged that Fannan knew of and disregarded an excessive risk to Sapp. *See Hathaway*, 37 F.3d at 66. Because

Carter-Sapp therefore has not alleged that Fannan "act[ed] in a deliberately indifferent manner," *see id.*, her Eighth Amendment claim against Fannan is subject to dismissal.[6]

## III.   LEAVE TO AMEND

Carter-Sapp requests leave to amend to "flesh out the affirmative link between Fannan's conduct and [Sapp's] diminished safety which led to his demise." Docket Item 21 at 1. Although leave to amend should be "freely give[n]," *see* Fed. R. Civ. P. 15(a)(2), "denial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured," *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (internal quotation marks omitted). And Carter-Sapp says nothing about how she would "flesh out the affirmative link" that is absent here, nor does she explain why any additional factual allegations that could provide such a link were omitted from the complaint in the first place.

Nevertheless, the Court grants Carter-Sapp leave to amend her complaint. *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) ("[T]his circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint

---

[6] Although neither party has pointed to a case with facts analogous to those here, this Court has identified a recent case in which a prisoner who participated in a drug-distribution ring brought a similar Eighth Amendment claim against the defendant-officers who participated in the ring. *See Johnson v. Morton*, 2022 WL 1556404 (S.D.N.Y. May 17, 2022). In that case, however, the plaintiff alleged that the defendants forced him to distribute drugs in prison and that one defendant threatened him with disciplinary action if he refused to distribute. *See id.* at *1-2. Here, by contrast, the complaint lacks any allegations about Fannan's role in the distribution scheme beyond his general participation in the ring and his ultimate arrest. And nothing in *Johnson* suggests that allegations as attenuated as those here are enough to withstand a motion to dismiss.

under Rule 12(b)(6)."). Within 30 days of the date of this order, Carter-Sapp may file an amended complaint addressing the deficiencies noted above.

## **CONCLUSION**

For the reasons stated above, Fannan's motion to dismiss, Docket Item 19, will be GRANTED unless Carter-Sapp files an amended complaint correcting the deficiencies outlined above within 30 days of the date of this order. Fannan may answer, move against, or otherwise respond to any amended complaint within 30 days of its filing. If Carter-Sapp does not file an amended complaint within 30 days, then her claim against Fannan will be dismissed, and the Clerk of the Court shall terminate Fannan as a defendant to this case.

SO ORDERED.

Dated: June 16, 2022
        Buffalo, New York

                                      */s/ Lawrence J. Vilardo*
                                      LAWRENCE J. VILARDO
                                      UNITED STATES DISTRICT JUDGE