UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KAILAH CARTER-SAPP, as Administrator
of the Estate of JEFFREY SAPP, Deceased,
191 Fairgreen Drive Index No.
Amherst, New York 14228,
              Plaintiff                  **AMENDED COMPLAINT**

vs.                                 Civil Action No: 1:20 cv-1889

CORRECTION OFFICER HUPKOWITZ,
CORRECTION OFFICER FELDMAN,
WATCH COMMANDER KIBLER,
THOMAS J. STICHT, SUPERINTENDENT OF WYOMING
CORRECTIONAL FACILITY,
JOHN DOE 1
FACILITY HEALTH SERVICES DIRECTOR,
FORMER CORRECTION OFFICER
WILLIAM FANNAN,
              Defendants.

_____

## <u>JURY DEMAND</u>

Trial by Jury on all issues is demanded

## <u>PRELIMINARY INTRODUCTION</u>

1. This is a civil rights action brought pursuant to 42 United States Code ("U.S.C.") §1983 for violations of Plaintiff's right to be free from the deliberate indifference to his safety and security, as provided to him under the 8th Amendment of the United States Constitution. Further, his right to be free of excessive force during a seizure was also violated, as he was killed. Specifically, despite knowing that there was an extreme risk to Mr. Sapp's safety and security, Mr. Sapp was placed in an isolated unit and not given protection. He was then attacked and killed. While the official finding was that Mr. Sapp committed suicide, to a man, all Wyoming County inmates state it is impossible to hang oneself in the Segregated Housing Unit where Sapp was. As such, he was likely killed by the individuals who he was with at the time of his death, aka Defendants Feldmann and Hupkowitz. Defendants Kibler and Sticht showed

deliberate indifference to Sapp's safety, which directly resulted in his death. Former Wyoming Correctional Facility Officer William Fannan also demonstrated deliberate indifference to Sapp's safety and security needs by utilizing Sapp to run drugs through the prison, thereby putting Sapp in danger. Such danger reached a boiling point when Fannan was arrested and charged with bringing drugs into the prison subsequent to a state police investigation. As Sapp was coerced by Fannan to run drugs through the prison, Sapp had intimate knowledge and was involved with the scheme to infiltrate the facility with drugs, most notably synthetic marijuana, aka K2. Sapp had knowledge as to the individuals involved with such scheme and was thereby a liability to the above-referenced Defendants.

2. Thus, he was moved into segregated housing in mid December, 2017 and then met his demise in the next 48 hours. Such amended complaint is being brought pursuant to the Court's decision issued on June 16, 2022 dismissing the complaint against Fannan unless an amended complaint is filed within 30 days of the Order issued. (Dkt. 24). As the 30th day from that order fell on a weekend, this amended complaint is timely pursuant to New York State General Construction Law Article 2, Section 20. To the extent that these details were not set forth in the prior complaint, the decedent's sister, Ella Anderson, is the source of much of the new information within this amended complaint. Ms. Anderson was unavailable when this initial complaint was filed.

## **JURISDICTION**

3. Plaintiff brings this action to recover damages for the violation of his civil rights under the Eighth and Fourth Amendments of the United States Constitution, codified at 42 U.S.C. § 1983 and as bestowed upon the states and its citizens through the Due Process Clause by the Fourteenth Amendment of the United States Constitution.

4. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1332 (federal question) and § 1343 (civil rights).

5. Declaratory, injunctive, and equitable relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

6. Costs and Attorney's fees may be awarded pursuant to 42 U.S.C. § 1988 and Federal Rules of Civil Procedure ("FRCP") Rule 54.

7. As mandated by the Supremacy Clause, in relation to actions brought pursuant to 42 U.S.C. § 1983, Plaintiff does not have to comply with Municipal Law Section 50-e with regard to filing a Notice of Claim for Federal causes of action.

8. At all times here mentioned, Defendants were acting under the color of state law, to wit, under color of statutes, ordinances, regulations, policies, customs and usages of the City of Buffalo and State of New York.

## VENUE

9. This action properly lies in the Western District of New York, pursuant to 28 U.S.C. § 1343(3) because the claims arose in this judicial district and the Defendants reside in and/ or do business in Erie County.

## PARTIES

10. The plaintiff, Kailah Carter-Sapp, as Administrator of the Estate of Jeffrey Sapp, at all times hereinafter mentioned, was and still is a resident of the Town of Amherst, located within the County of Erie and the State of New York.

11. On or about August 22, 2019 the Plaintiff, Kailah Carter-Sapp, was appointed Administrator of the Estate of Jeffrey Sapp, pursuant to a Decree of the Surrogate's Court of the County of Erie and State of New York, and Limited Letters of Administration of the Estate of Jeffrey Sapp were issued to the Plaintiff Kailah Carter-Sapp, and the said Plaintiff thereupon duly qualified and thereafter acted and is still acting as such Administrator, as well as the personal representative of the decedent. (Such letters are attached hereto as *Exhibit A*).

12. Wyoming Correctional Facility Officer Hupkowitz was and is a New York State Corrections Officer working at Wyoming Correctional Facility, 3203 Dunbar Road, P.O. Box 501 Attica, NY 14011-0501 (Wyoming Co.) during the period of Jeffrey Sapp's incarceration at the same. Hupkowitz is sued in his individual capacity.

13. Wyoming Correctional Facility Officer Feldman was and is a New York State Corrections Officer working at Wyoming Correctional Facility, during the period of Jeffrey Sapp's incarceration at the same. Feldman is sued in his individual capacity.

14.     Watch Commander Kibler was and is a New York State Corrections Officer working at Wyoming Correctional Facility, during the period of Jeffrey Sapp's incarceration at the same. Kibler is sued in his individual capacity.

15.     Thomas J. Sticht was and is a New York State Corrections Officer working at Wyoming Correctional Facility, during the period of Jeffrey Sapp's incarceration at the same. Sticht is sued in his individual capacity.

16.     Wyoming Correctional Facility Health Services Director John Doe was and is a New York State Corrections Health Services Director working at Wyoming Correctional Facility, 3203 Dunbar Road, P.O. Box 501 Attica, NY 14011-0501 (Wyoming Co.) during the period of Jeffrey Sapp's incarceration at the same. Doe is sued in his individual capacity.

17.     Wyoming Correctional Facility Former Officer William Fannan was a New York State Corrections Officer working at Wyoming Correctional Facility, during the period of Jeffrey Sapp's incarceration at the same. Fannan is sued in his individual capacity.

## RELEVANT FACTS

18.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through " 17" of this Complaint with the same force and effect as if fully set forth herein, and alleges as follows:

19.     The Plaintiff, Kailah Carter-Sapp as Administrator of the Estate of Jeffrey Sapp, Deceased, at all times hereinafter mentioned, was and still is a resident of Amherst, located within the County of Erie and in the State of New York.

20.     On or about August 22, 2019 the Plaintiff, Kailah Carter-Sapp, was appointed Administrator of the Estate of Jeffrey Sapp, pursuant to a Decree of the Surrogate's Court of the County of Erie and State of New York, and Limited Letters of Administration of the Estate of Jeffrey Sapp were issued to the Plaintiff Kailah Carter-Sapp, and the said Plaintiff thereupon duly qualified and thereafter acted and is still acting as such Administrator, as well as the personal representative of the decedent. (Such letters are attached hereto as *Exhibit A*).

21.     Plaintiff Kailah Carter-Sapp is the Decedent Jeffrey Sapp's next of kin, she has survived the Decedent, and has been appointed as the personal representative of the decedent.

22.     Decedent Sapp was transferred to Wyoming Correctional Facility approximately 8 months before his death on December 19, 2017.  He was excited to be closer to his children and family as he only had two years left on his prison sentence.

23.     Upon entering said facility, Defendant Fannan told Sapp that he needed assistance in bringing K2 and other drugs into the prison. Fannan was aware that Sapp had dealt drugs at some point when Sapp was on the street. Sapp felt compelled to comply with Fannan given the power dynamic between inmates and prison guards.

24.     Sapp then recruited his sister, Ella Anderson, to help assist him in the scheme. As such, Anderson would receive Western Union money orders from family members of inmates who were purchasing said drugs, and which she would then transfer to cash and then subsequently meet up with Fannan to provide him with funds.

25.     Anderson met Fannan roughly 10 times in 2017 and provided him with hundreds of dollars of cash each time. Sapp would receive a small cut of the proceeds of the sales.

26.     Anderson would meet Fannan at various different gas stations in the City of Buffalo during this time frame.

27.     Fannan confided in Anderson that he was running drugs into the prison to make some additional cash as he had been in an "ugly divorce."

28.     Sapp had told Anderson that an Officer in the prison had threatened him should he not comply with the directives given to him by any Correction Officer.

29.     On one of the occasions that Anderson met Fannan, she told him about her brother being threatened if he didn't comply. Fannan assured her that so long as Sapp continued to do as he was being asked, he would be okay.

30.     Anderson continued to participate in the drug conspiracy as she believed if she did not do so, her brother would be in imminent danger.

31.     In the weeks preceding his death, Decedent Sapp had told his Corrections counselor at Wyoming Correctional Facility that he was afraid for his life.

32.     All named Defendants were made aware both of Sapp's fears as well as the fact that he had mental health issues and suicidal ideations.

33.     Decedent Sapp called his sister, Ella Anderson, and stressed to her the importance of her visit the weekend just prior to his death, stating that it was a "life or death situation". Ms. Anderson promised she would visit.

34. Ms. Anderson kept her promise and visited with decedent Sapp. Decedent Sapp proceeded to tell Ms. Anderson that a supervising Corrections Officer, believed to be a Sergeant (identity unknown) called him into his office for an off the record meeting. The supervisor told decedent SAPP that they had a zero tolerance policy and that there would be severe consequences for his behavior. Decedent SAPP tried to ask the supervisor what he was referring to but he was told to return to his dorm. As referenced, Decedent Sapp was involved in a ring in which Wyoming Correctional Officers would bring drugs into the facility to give to the inmates, including Decedent Sapp, to distribute.

35. During the meeting with his sister, Decedent Sapp told Ms. Anderson that as a result of the meeting with the above-referenced Officer, he had been unable to sleep and had a very bad feeling. He also stated that he was considering a transfer request as he was in fear for his life.

36. Decedent Sapp told Ms. Anderson that there were Correction Officers who wore black gloves all the time, and it was known that they were not to be reckoned with; and that such Officers were part of a gang.

37. Decedent Sapp then told Ms. Anderson that he reconnected with Quincy Nolle, who he knew from the neighborhood. Mr. Nolle was involved with several other inmates and Correction Officers, including William Fannan in the distribution of K2 (synthetic marijuana) within the Wyoming Correctional Facility.

38. While one of the Correction Officers, CO Fannan, was arrested and charged with promoting prison contraband on December 18, 2019, Decedent Sapp knew of other state actors involved in the distribution ring. In fact, outside law enforcement agencies such as the New York State Troopers and Wyoming County District Attorney's office had sought to speak with Sapp relative to the guards involved with drug smuggling. As such, Decedent Sapp being isolated and moved to the segregation unit on the same date as Fannan's arrest was done with the intent to keep Decedent Sapp silent about what he knew relevant to other criminal state actors.

39. As stated, on December 18, 2017 decedent SAPP was placed in the Special Housing Unit (SHU).

40. On or about December 19, 2017 at 8:10 a.m., Decedent SAPP was seen by facility medical director, Dr. Shiekh during morning rounds. Decedent SAPP told Dr. Shiekh that he was on a hunger strike and refused his morning meal. Dr. Shiekh encouraged fluids for decedent

and subsequently notified defendant, Facility Health Services Director (name currently unknown), about decedent's hunger strike.  Dr. Shiekh was told by an SHU Correction Officer (name unknown) that a mental health referral was in place. Despite Decedent Sapp's threat to self-harm, as well as the surrounding circumstances indicating that Sapp could be a grave danger to himself, or that others could be a grave threat to Decedent Sapp, there was no special monitoring done of Decedent Sapp.

41.     This removal of Sapp to a secluded section of the jail amongst individuals who were involved in the drug running ring was at the behest of Defendants Sticht and Kibler.

42.     Sapp had told Kibler and Sticht, along with other officers who moved him, that such a move would jeopardize his life.

43.     According to incident reports authored by the Defendants, at approximately 1:30pm on December 19, 2019, Defendant Hupkowitz was conducting rounds and noticed that the window into decedent SAPP'S cell (B-16), was obstructed with paper.  Defendant Hupkowitz knocked on the cell door and instructed decedent SAPP to remove the paper.  When decedent Sapp did not respond, Defendant Hupkowitz yelled to officers located at the officers' station for assistance and continued to do his rounds.  He did not look through the slot to see if the Decedent was in distress nor take any other action.

44.     Defendant Feldmann then attempted to get decedent SAPP to respond to requests to remove the paper from the window.  Decedent Sapp did not respond.

45.     A Correction Officer then ordered decedent Sapps' feed-up food slot to be opened. He then observed through the slot that decedent Sapp was slumped over with a bed sheet tied around his neck and was unresponsive.  Then he ordered the decedent's cell door opened. This was roughly 10 minutes from the time Hupkowitz had first seen that the Decedent's window was obstructed. Had Feldmann, Hupkowitz, Sticht and Kibler not been indifferent in their response, Sapp would still be alive. Further, had Fannan not been deliberately indifferent to Sapp's safety and security needs by coercing him to help sell drugs in the prison, Sapp would likely be alive.

46.     When the door was opened, decedent Sapp had a bed sheet around his neck and tied to the window. He was not hanging but was slumped over; still unresponsive.  Whereupon an officer (unnamed) was directed to go and get the "cut down" implement.

47.     Decedent Sapp was, after a time, then cut down by Correction Officers.

48. Decedent Sapp had a pulse and was breathing when several of the defendants entered his cell and removed the sheet from around his neck. An AED machine was made available but was not used. CPR was performed.

49. Upon arrival to the scene, Nurse Gugino came to decedent's cell and instructed that decedent Sapp be taken immediately to the facility's infirmary.

50. On December 19, 2017 at 2:08pm decedent Sapp was pronounced deceased by Defendant, Dr. Shiekh according to Wyoming County records. However, decedent Sapp's death certificate lists the time of death as 4:51p.m.

51. On December 19, 2017 at approximately 2:30 p.m. Deacon Brian Walkowiak notified decedent SAPP'S sister, Ms. Anderson, of his alleged suicide. However, Deacon Walkowiak states that decedent Sapp was found dead in the morning. When questioned by Ms. Anderson as to why she was just being notified now as to her brother's death, she was told that the delay was because they did not have a number that she could be reached at that time. Nevertheless, Wyoming Correctional Facility records indicate that the call was placed at 3:03 pm.

52. Decedent had a prior history of psychiatric issues that were documented in Correction records dating as far back as April 2007. Moreover, decedent had an extensive medical history, as he complained of several medical issues and was fearful that he would die from cancer or some other disease, and was constantly seen by medical staff. He also had voiced suicidal ideations throughout his time in New York State custody. All named Defendants were aware of the decedent's medical and psychiatric history. Anderson had relayed much of her brother's medical history and her concerns for him during one of her meetings with Fannan. Yet, Fannan continued to use Sapp to transport and sell drugs in the prison.

53. Upon information and belief, as a result of several instances of deliberate indifference to decedent's safety and security as well as his medical needs, the decedent Sapp died, when in fact there were more than enough reasons for such an alleged occurrence not to have happened given decedent's mental health issues, the on-going criminal investigations, hunger strike and his apparent fear for his life which he had intimated to both Corrections staff and his family.

54. Due to the high profile criminal investigations which led to the arrests of several inmates and at least one Corrections Officer, William Fannan, Defendant Superintendent

Thomas J. Sticht should have seen to it that the decedent was more intensely supervised or transferred, and when informed of the hunger strike, should have taken steps to ensure that the health and well-being of the decedent was protected. Instead, Sticht removed Sapp to a segregated and silent portion of the jail where he was even more in danger.

55. Just as importantly, the Defendant John Doe, the Facility Health Services Director (name presently unknown) should have been more vigilant in making sure that decedent Sapp was seen by mental health staff as directed by New York State Correction Law section 137 immediately to assess decedent's mental and physical health and the maintenance of same, especially in light of information regarding his hunger strike.

56. Said Defendants owed a duty to the Decedent, and instead showed deliberate indifference to his safety and security. Such indifference directly resulted in the death of Jeffrey Sapp.

57. As a result of the deliberate indifference as set forth above by both security and medical staff which culminated in the wrongful death of the decedent Sapp, the Plaintiff, Kailah Carter-Sapp, as Administrator of the Estate of Jeffrey Sapp, Deceased, claims personal injuries and resulting damages on behalf of decedent's distributees. Such damages include but are not limited to the Decedent's conscious pain and suffering suffered prior to his death, his apprehension pending death, and punitive damages.

**FIRST CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS FOR VIOLATING DECEDENT'S'**
**RIGHT TO A MINIMUM STANDARD OF SAFETY/ SECURITY AS**
**GUARANTEED HIM BY THE 8TH AMENDMENT**
**(42 U.S.C. §1983)**

58. The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through " 57" of this Complaint with the same force and effect as if fully set forth herein.

59. Upon information and belief, at all times hereinafter mentioned, all named Defendants, both individually and collectively, exhibited deliberate indifference towards Decedent Sapp's security and safety.

60. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, prison officials are liable for harm

incurred by an inmate if the officials acted with deliberate indifference to the safety of the detainee. Two factors determine deliberate indifference: First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm, and second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent.

61. In this case, decedent Sapp has clearly established that he was under a substantial risk of serious harm.

62. Such indications consist of but are not limited to: the threats, both explicit and implicit from Correctional staff, Sapp's own mental health history and current hunger strike, Sapp's own state of mind, and his subjective feelings of fear and dread that he conveyed to prison staff.

63. Furthermore, said Officials, both individually and collectively, exhibited deliberate indifference to Sapp's safety and security needs by involving him in a drug running ring, leaving him unattended, unwatched, not taken to a medical unit, and left him in his cell in a manner that would completely obviate his cell from anyone trying to look in.

64. As a result of such indifference, Sapp died.


Wherefore, Plaintiff requests that the Court holds the Defendants Hupkowitz, Feldmann, Kibler, Thomas J. Sticht, Superintendent, John Doe 1, And William Fannan, either jointly or severally liable, in the First Cause of Action in the amount that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction; and for such other, further or different relief as the Court may deem just and proper, together with the costs and disbursements of the action.


Dated:     July 18, 2022
           Darien Center, New York


                              By: /s/ Matthew Albert
                              Attorney for Plaintiff
                              2166 Church Rd.
                              Darien Center, New York 14040
                              (716) 445-4119